First case on this afternoon's docket is the case of Temple v. Curtis Parrott and we have here, let's see, we have Mr. Cohen for the My name is Jordan Cohen. I represent Curtis Parrott. Mr. Parrott was convicted of indecent solicitation of a child after he engaged in online communication of a very sexual nature with a 15-year-old girl, E.U. Now the crux of this case comes down to whether the specific intent to actually commit the sex offense rather than just talk about it was proven by the state beyond a reasonable doubt. So I'm going to start by giving a little bit of background on Mr. Parrott and then I'll go into the actual messages and the communications and then I'll go into how those messages could be categorized or fit within various of the offenses that we have and finally I'll show even more reasons why he did not have the specific intent that was required. So first, Mr. Parrott was 35 years old at the time of the offense, but he's not a normal 35-year-old. In fact, he was adjudicated as a disabled adult because he's been diagnosed as being mild mentally retarded. Dr. Cuneo wrote in his report that Mr. Parrott has the cognitive abilities of an 11-year-old, so that would be even below that of the 15-year-old he was talking to. And this is evident just from looking at the messages and the communication. If you look at some of his wording and grammar, you can kind of tell this is not exactly the most fully functioning adult. Now speaking of these messages, the good thing about this case is all their communication took place on Facebook Messenger, so it's just a chat log. So we have the entire communication from start to finish of when Mr. Parrott spoke with EU. Now, these messages are graphic. They contain graphic language. They are salacious. There is erotic banter. Basically, there's no shortage of messages that the state could quote for you here today, which I suspect they might, to show just how sexual the conversation was. And there's no dispute over that. The conversation was sexual. However, there is one part that is missing from these messages. You will not hear any quote that the state might pull up today. You will not hear any mention of logistics, any mention of trying to transform this sexual fantasy into a logistical, physical reality. So you will not hear any when, any where, any how of when these two people would actually meet to actually commit the sex offense. There is no semblance of a plan or a meeting or an arrangement or even a suggestion or a request for a meeting for these two people to meet. It's all took place behind their computer screens. And Mr. Parrott did not physically go anywhere or do anything. It's all behind his computer screen. Of course, if you read through the messages, this is not to say that the communication was totally innocent or even legal. So I want to look at different offenses. And I think it would be helpful to look at four different offenses to kind of see what his messages might fit into. So I want to start at the top. So you would have the actual sex offense at the top, which is if they were in person, there's physical contact, sexual contact, and they're committing an actual sex crime. That's the sex offense that needs to be attended. Below that, you would have attempt. So that would be if the defendant travels to a location in order to commit that sex offense, and maybe it doesn't work because the police show up and they get arrested, and that's the attempt. And the city is correct that they don't need to show attempt. They don't need to show that Mr. Parrott traveled anywhere because below attempt is solicitation. Now, solicitation is how the arrangements are going to be made to travel to that location where you could have the attempt of the sex crime. Just according to the statute, solicit means to command, authorize, urge, incite, request, or advise another to perform an act. So the state doesn't need to show that he actually traveled to the place or that he even agreed on a plan, but they do need to show that there was at least a request or an urge or a command to make these arrangements so that you could go to the next step of the attempt, and then you could go to the next step of the sex offense. And I also want to go one step prior. So below solicitation, you have harmful material. Now, a person is guilty of distributing harmful material to a minor when he not only depicts to a minor any material which contains explicit and detailed verbal descriptions of sexual incitement or sexual conduct. This is exactly what Mr. Parrott did. If he was charged with harmful material, there really wouldn't have been a defense because that describes exactly what he did. So it's important to distinguish this harmful material statute with solicitation because they both involve these descriptions of sexual contact or sexual conduct. But the difference is solicitation is one step further because you have to have the intent to actually commit this fancy, this sexual conduct in real life. That intent has to be there with solicitation. So here, the state, this is an element of indecent solicitation that the state had to prove. They never did prove this. There is no time or place or any type of meeting where this was going to be acted out. Basically, it never went past step one of describing the sexual conduct. Well, I think that they contend that giving her his phone number, I guess, was preliminary to arranging something. Your Honor, that could be possible. However, there is no testimony that during the phone calls that they had, which there were two or three, that they ever discussed anything I've mentioned of the logistics, of the time or the place. In fact, there's testimony from EU that on the phone they talked about sports and they made small talk and there wasn't sexual conduct on the phone. And even if there was something like phone sex, that would be different than the second step of actually arranging this in real life. So obviously, we don't have the audio of the phone. We don't know what happened. But there was no evidence at trial that he did his second step in the phone conversation that he didn't do online. So the state didn't present any evidence that it did come from that. Can you tell me a little bit more about his living situation? He was in some type of residential facility? Yes, Your Honor. He lived in a place that was 24 hours and he needed a signature to come and go. This is because of his disability. So logistically, he really could not actually go. If he's not in control, he doesn't have the autonomy to go places because he's in this facility and someone has to sign him out. And he's been adjudicated as a disabled adult. So I believe his sister would sign him in and out when he'd have to go places. He didn't drive then? Did he use public transportation? Your Honor, I believe he would usually get a ride. I believe he did have a job that he worked at and there would be arrangements that someone would drive him to and from the job, but he wouldn't drive himself. So I also want to go to, so far we've talked about the lack of intent, but I want to talk about what I would consider the backwards steps he took. Because of course, for him to have any intent, he's got to be wanting to go towards the direction of that sex offense. But he actually went away from committing the sex offense in numerous ways. So first, at the beginning of the conversation, he said that he lived in Florida instead of living in Illinois. And that's not something he said just to lure her in because he maintained throughout the entire conversation from start to finish, he never changed. He always said he was from Florida. He never made any comments saying, hey, I'm thinking of coming to Illinois for the weekend. Where did he live? I thought he lived in Farmington? I believe he lived, yes, I believe that's correct, Farmington. Farmington, Missouri? Yes, Your Honor. He lived, it was about an hour and a half away from where E.U. lived. But he said that he lived in Florida. So it would have had the idea that they're nowhere near each other. He also never asked E.U. anything about where she lived. He never said where do you live or where do you go to school. There was no discussion of a time or a place where a physical meeting could ever take place. Also, at the end of the messages, the messages ended because E.U. said we can't talk anymore. And Mr. Parrott responded, okay, and that was the end. He never responded again after that. He broke off the messages. So that was the last conversation with the actual minor? Yes. And then he picked up a conversation with the officer? Yes, Your Honor. So basically, there's a lot of messages with him and the minor, but the bulk of them came on one day. So even though there's a lot, it's not something that dragged out for weeks or months. Most of it is one day. And then Special Agent Aaron Cooper gets involved, and he goes on the Eat the Girls Facebook profile. So he's posing as her, and he tried two or three times, he said, to get Mr. Parrott to meet. That was like his goal because that's how you would have proof of intent definitively if he actually traveled to meet somewhere. And Special Agent Aaron Cooper testified that those attempts were unsuccessful. So Mr. Parrott was given the opportunity, and he refused. He did not meet. So also, these are why I say that these are backward steps. He says he was in Florida. He never inquires about any time or place where he could meet, and he's even given the opportunity, he refused. Your Honor, if I may, I don't think... You have the opportunity for rebuttal. Okay, thank you. Thank you, Mr. Daly. Good afternoon, Your Honor. My name is Patrick Daly. I'm here on behalf of the state. I think the counsel pretty well hones in on the specific issue that's for this court, and that is what constitutes or was the proof made in this case of what would be the second element of solicitation of a minor, which would be whether or not the defendant did this act of discussing sexual conduct or penetration that was done with the intent of the offense of aggravated criminal sexual abuse being committed. It's an interesting question because, Your Honor, it is... The defendant cites a number of cases where the proof of the intent has been manifested by an over-physical act of arranging, sometimes even driving oneself to a location where some prearranged meeting place had been taking place, where we don't have that happening in this case. So the uniqueness of this is it requires this court to sort of interpret how specific intent is proven and to what degree facts are needed to be established in order to establish specific intent. We know that solicitation... Well, first of all, I disagree a little bit with counsel that solicitation is below attempt and is kind of this tiered... Solicitation is different than attempt because it just constitutes a different type of code of defense altogether. Attempt is where you take a substantial step towards a commission on a murder, lying, or crime. Solicitation is different. There is the command and the request to perform a particular act. Here, the statute itself defines this act of solicitation as command, authorized, urgent, cite, request, or advise another to perform any act which would constitute the sexual act. The hallmark of all solicitation offenses is that the commission of the offense is itself completed upon the act of solicitation. So there is no requirement that you take any step beyond the request to commit the particular act. Now, the intent to engage in this act is going to be proven by the circumstances of the case, by the totality of the circumstances, if you will, based upon the words that are used and the actions of the defendant. So on the defendant's formulation, if we had an instance here, which we don't have, I acknowledge, where the defendant had gotten online and said, Hey, I want you to buy a bus ticket or something and come down here so we can have sex. Under the formulation of solicitation, once that request has been made, the act itself is complete. The crime itself is complete. There's not logistics, you know, possibility of it, or not considerations for solicitation. A factual impossibility is not a defense of this type of thing. If it were, then every act of solicitation with an undercover officer for, let's say, prostitution would be unprosecutable because there's no factual likelihood or reality that the offense would ever be committed. That's why this is a warrants crime. This is a crime where a request or urging or whatever is made coupled with, you know, that does actually take place. This is what the defendant wanted. But I think what Mr. Cohen's trying to state is that it seemed like it was more a fantasy that he would never even intended to take place. I think I understand that argument to be what the defendant's position is. Here, in this case, our position is principally this. We have a series of conversations that took place here. I'm not going to scrawl them out for the court. The court can read them. They are very graphic. And I cannot include all these in a brief simply to kind of paint the defendant in a bad light. It's to perhaps illustrate the greater point that the defendant's sort of, you know, interplaying content with the defendant served a dual purpose. And I try to highlight language. Number one, it's to take what the defendant perceived to be a young girl and engage her immediately into a highly sexualized conversation content in a context in which it's not the defendant fantasizing simply about sex but encouraging, if you will, the victim to fantasize about having sex with him. All right? Then you see... But if you just leave it there, there's... Correct. I agree. ...no crime... That's right. ...that fits the... That's why that's a part two. Okay. I'm not trying to talk it over. What can you point to in the record that would constitute urging, encouraging, or requesting? Well, that's what makes this case a bit tricky, a little bit different than you think. It's straightforward. I want you to do this or to do this. What we have here is interspersed with these sexualized contact, you know, a grooming, if you will, are comments from the defendant that if you're here, we'll do this. If we were together, we would do this. If, you know, I would do this to you if you were with me at this time. There's several instances of that. And our position is simply that when viewed in totality with all the conversations, the defendant was actually urging this particular victim to want to be part of an encounter with the defendant that was sexual in nature. That's how the trial court is ultimately ruling in this case with the bench trial. And I see Justice Chaffin sort of squinting her eyes at me. I'm just trying to connect the dots. It's somewhat of an unorthodox argument that I acknowledge that because typically solicitation cases are very straightforward in the sense that I'm going to give you $100 and I want you to go murder this guy that put me in jail or something along those lines. Our position is that the intent does not have to actually take place. The intent is actually inherent to the urging, the act of the urging itself. In other words, the defendant comments here that the court, and this is really a trifecta issue. The court came to the conclusion that when he made these, he did want this to happen. It was his intent. In real life or in fantasy? It doesn't matter. In our position, it doesn't matter. The statements were not made simply as just sort of random joking, but were in fact intended to draw this particular victim into the situation. And coupled with the fact that they did have phone contact, so there was direct person-to-person contact. And that's simply, you know, eye of the internet shaft, if you will, now as a consideration of the court. Well, why would he say he lived in Florida, which would obviously complicate the actual act of getting together? I don't want to go beyond the facts of this case, so let me just hypothesize, if you will. A lot of times these grooming-type cases, if they go on for an extended period of time, usually involve releasing information sort of piecemeal. I notice this defendant is not particularly sophisticated, and I'm not going to argue the contrary. But on the other hand, you know, often they aren't. Nonetheless, there's at least an understanding that the type of communication that's being done is not, you know, legal or at least, you know, proper. So there is a degree of caution, if you will, entering into it, where then things may progress to something more. And again, I'm not saying that's what happened here. I emphasize that I'm not arguing that these are the facts here. I'm just simply arguing in response to the question, Your Honor, that there is a rational explanation why he would not be truthful at the outset. This conversation has been going on for about two to three days before she terminated it. So what's our standard of review? The standard of review would be the standard for any reasonable doubt. And that would be evidence viewed in the light most favorable to the State, and whether any rational trial or fact could find that the elements of the offense have been proven beyond a reasonable doubt. So in this case, where the parties have focused in principally on this one element, which would be element two of the solicitation of a minor, that a trial or fact could, one view of the evidence in context and in total could find that the defendant's intent in this regard was in fact that he was wanting to and was urging a situation in which he would have a sexual act with this particular woman. I have a note that Agent Cooper tried several times to entice him to set up a meeting. Without success. And he didn't bite. That evidence has not really developed a trial. I know the defendant argues that it's to some length, particularly in his reply brief. You know, we all know the circumstances of that, and I don't want to speculate in that regard, other than the fact that obviously this sort of stemmed into this sort of sting operation that we talked about before, which is a fairly common investigative route. The State brought out, I think, largely because of probably the sense the defendant was going to bring it out. And, you know, from a tactical standpoint, but we really don't know much more about what the contents of the conversations were, what the defendant said or what happened at all, other than, you know, the agent acknowledged that he attempted to make contact and was unsuccessful. That's really all I have on that here. If you have any further questions. I'm wondering why they didn't charge him with harmful material. Well, can you read the record, assuming you haven't already? No, I haven't. Okay. Well, I assume the prosecutor actually kind of made sort of a half-hearted attempt to throw that out there as an alternate offense. My research shows it's not a lesser-included, so it's not something I'd be able to argue now that, you know, this court can impose a sentence for. It's just a separate charge altogether. So we obviously have issues there. We can't throw a lesser-included, and I would argue, well, if not this, then the court didn't take it up in any regard. But the prosecutor did sort of say, well, we do have this, you know, penis photograph, and that would be harmful material. In the end, that just constituted part and parcel of the greater evidence of a solicitation. Thank you. Thank you. Do you have rebuttal, Mr. Cohen? Yes, Your Honor. Your Honor, the State mentioned that the crime of solicitation is complete when the words are uttered. And, of course, that has to be coupled with the intent. But the State said that the offense is complete when the words are uttered. And yet they could not point to the specific words that would make this crime complete, the words that would go past the fantasy and transform it into reality. Specifically, the State said that it doesn't matter whether this is fantasy or whether this is real life. And frankly, that's, I think, where the big disagreement in this case is. And this is why this is a legal question. And so, you know, the facts really aren't in dispute because we all have the same facts. But it's really the legal question of does it matter if it's the fantasy or the reality. And here, you know, someone could fantasize about robbing a bank, for example. You know, they could talk about it with their friend and say, imagine how much fun it would be to rob a bank. Imagine what we could do with all this money. Like, imagine how awesome that would be. That wouldn't be solicitation. It wouldn't be solicitation until they came up with a specific bank and a time and say, oh, we're going to do this by doing this, or we're going to hit this bank. You know, without any, not even one detail about how this offense is going to be committed, that's not solicitation. This is just fantasy. And the State commented that this case is tricky because we don't have that. But I would argue that is why this case is not tricky. And this case is very straightforward because none of those arrangements or requests or urge or authorize or any of those words, none of those are present here. And so the State could not show any of any going to step two. He is stuck at step one of detailing sexual conduct. And the State also argued that, you know, if you add up all the graphic language, that that somehow moves it to step two. But really, this is still stuck on the harmful material. That is what he did. Solicitation requires a further step that was never proven here. And ultimately, as you have here, you have no discussion of a meeting, which the State concedes, no logistic, no plans, no arrangements, no suggestion, no request. If you add all that together, there is no intent. And there's no proof of intent. There is no proof that he ever, Mr. Parrott ever wanted to transform the fantasy into the reality. And that intent is needed for solicitation. There's got to be some further step than just using graphic language to a minor. So for that reason, I believe that no rational true effect could find that the State proves this element of intent at trial. And, therefore, I request that Mr. Parrott's conviction be reversed. Thank you. Thank you, Mr. Cohen. Mr. Daley, this is a matter under advisement.